IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| TED D. VALLEJOS,<br><br>Plaintiff,<br><br>v.<br><br>ORBITAL ATK, INC.,<br><br>Defendant. | **MEMORANDUM DECISION<br>AND ORDER**<br><br>Case No. 2:20-CV-101<br><br>Howard C. Nielson, Jr.<br>United States District Judge |

Plaintiff Ted Vallejos sues Defendant Orbital ATK, his former employer, asserting claims under the Americans with Disabilities Act and Title VII. Orbital ATK moves for summary judgment on all claims. The court grants Orbital ATK's motion.

I.

Mr. Vallejos began working at Orbital ATK in 2014 as an ACCE mechanical maintenance technician. *See* Dkt. No. 33-2 at 2; Dkt. No. 33-4 at 3 ¶ 4. Mr. Vallejos reported to Ron Secrist, who in turn reported to Chris Desborough. *See* Dkt. No. 33-4 at 3 ¶ 3. By all accounts, Mr. Vallejos was a high-performing employee. *See generally* Dkt. No. 33-5. At the time of the incidents that gave rise to this action, Mr. Vallejos had risen to the level of senior maintenance technician. *See* Dkt. No. 33-15 at 10:1–8.

In November 2016, while Mr. Vallejos was on medical leave, Orbital ATK instituted a new rotating shift policy for its maintenance technicians. *See* Dkt. No. 33-4 at 4–5 ¶¶ 12–13, 16. This policy required all "ACCE mechanics to rotate day and night shifts monthly" to ensure that "all maintenance and operational needs were met during each shift" and that "an equal number of electrical and mechanical technicians were scheduled on each shift." *Id.* at 4 ¶ 12. Although the policy applied generally, a few employees were designated as experts on certain equipment and

were assigned different schedules based on requirements specific to that equipment. *See id.* at 5 ¶ 15. But all other maintenance technicians were assigned to a rotating shift unless they took intermittent FMLA leave during the shifts they could not work. *See id.* at 4–5 ¶¶ 13–14. Despite these assignments, Orbital ATK explained to its mechanics that they could swap shifts with like-skilled mechanics on the opposite shift schedule, so long as the number of electrical and mechanical technicians remained equal for each shift. *See id.* at 4–5 ¶ 13.

Upon returning to work in early January 2017, Mr. Vallejos learned that he was assigned to the day shift until the end of the month. *See* Dkt. No. 33-4 at 5 ¶ 16; Dkt. No. 33-15 at 26:6–22. But starting February 1st, he would be assigned to the night shift. *See* Dkt. No. 33-4 at 5 ¶ 16.

Mr. Vallejos promptly submitted a letter from his physician assistant stating that "Mr. Vallejos is unable to work night shifts because he is needed to care for his wife in the evenings" because she had multiple sclerosis. Dkt. No. 33-18 at 2. The letter also explained that Mr. Vallejos "has diabetes and an alternating schedule could worsen his blood sugars." *Id.*

Upon receiving this form, Orbital ATK deliberated internally about how to accommodate Mr. Vallejos. *See* Dkt. No. 33-6 at 19–21. Although Orbital ATK had previously allowed Mr. Vallejos to work only day shifts, with the institution of the new rotating schedule, a permanent day-shift assignment for Mr. Vallejos would "cause an unbalance of maintenance manpower 50% of the time when Ted's assigned shift is working the 6 pm to 6 am shift." *Id.* at 17.

Ranae Hadley Dickey, a human resources specialist, decided after some back and forth with Mr. Secrist that Orbital ATK could not provide Mr. Vallejos a permanent day-shift assignment. *See* Dkt. No. 33-4 at 5 ¶ 17; Dkt. No. 33-6 at 16. Instead, she concluded that Orbital ATK could offer Mr. Vallejos additional and longer break times to help him manage his diabetes,

and that it would consider a request from Mr. Vallejos for FMLA leave to take care of his wife. *See* Dkt. No. 33-6 at 16.

Two weeks later, on January 20th, Mr. Vallejos met with Mr. Secrist, Mr. Desborough, and Ms. Hadley Dickey to address how the issues identified by Mr. Vallejos's physician assistant could be accommodated. *See* Dkt. No. 33-4 at 5–6 ¶¶ 17–18. But although Orbital ATK offered various suggestions, Mr. Vallejos refused to accept anything short of a permanent day-shift assignment. *See id.* at 6 ¶ 18–19. He insisted that he had "never miss[ed] a day," "never had a write-up," and "never been disciplined in any way or form," and that he "did anything that [Orbital ATK] ask[ed] [him] to do," and went "two miles over what [Orbital ATK] . . . ask[ed] [him] to take care of." Dkt. No. 33-15 at 55:8–12. Despite all that, he felt he was not being accommodated the same way other employees were. *See id.* at 51:4–53:11. Orbital ATK's representatives nevertheless maintained that a permanent day-shift assignment was not an option. *See* Dkt. No. 33-4 at 6 ¶ 18. Mr. Vallejos then asserted that Orbital ATK was "doing everything for the Anglo-Saxon men" who, he contended, received fixed shifts upon request. Dkt. No. 33-15 at 56:5–11, 57:3–58:18. By contrast, he claimed, "lowly Ted is a Hispanic, and he gets stepped on." *Id.* at 56:5–11.

Although unable to persuade Orbital ATK to give him a permanent day-shift assignment, Mr. Vallejos was able, through his own efforts, to arrange a shift swap with another mechanic, Yamaha Aswaf, before Mr. Vallejos's night-shift assignment began in February. *See id.* at 45:14–15; 54:212–25. The swap would provide Mr. Vallejos with a day-shift assignment until Mr. Aswaf finished school in April. *See* Dkt. No. *id.* at 42:24–43:7. But Mr. Aswaf's skillset was electrical, while Mr. Vallejos's skillset was mechanical. *See* Dkt. No. 33-4 at 6 ¶ 20. The swap would thus create unbalanced shifts and violate the rotating shift policy. *See id.* Even so, Mr.

Secrist approved it. *See id.*; Dkt. No. 2 at 27; Dkt. 33-15 at 54:24–55:2. Mr. Vallejos thus continued to work only the day shift until April 1, 2017. *See* Dkt. No. 33-4 at 6 ¶ 20; *id.* at 8 ¶¶ 26–27; *id.* at 36 (Ex. E); Dkt. No. 33-15 at 43:3–5.

When Mr. Vallejos came into work that day, Mr. Desborough gave him "disturbing news:" Mr. Vallejos had "been accused of sexual harassment." Dkt. No. 33-15 at 65:19–66:9 Stating that he "hate[d] doing" so, but had "a job to do," Mr. Desborough suspended Mr. Vallejos and placed him on leave. *Id.* at 73:12–18. Although Mr. Desborough initially indicated otherwise, *see id.* at 66:14–17, both Ms. Hadley Dickey and Mr. Secrist later clarified that the leave would be without pay, *see* Dkt. No. 33-6 at 51.

After the investigation was completed, Orbital ATK determined that Mr. Vallejos would "return from unpaid suspension" and "receive a Final Written Warning for violation of the Code of Conduct and Anti-Harassment and Offensive Work Behavior Policy." Dkt. No. 33-4 at 34. It further determined that he would "be transferred to another work area" with the same title and pay. *Id.* On April 5, 2017, Ms. Hadley Dickey informed Mr. Vallejos that he should report for work the next day. *See* Dkt. No. 33-6 at 49.

Before coming to work the next morning, Mr. Vallejos spoke with his union representative. *See* Dkt. No. 2 ¶ 31. The representative notified him that "it didn't look good" for him and that Orbital ATK would likely fire him for sexual harassment. *Id*. Spurred by fear that a sexual harassment complaint would be placed in his personnel file—which could "damage his career and employability"—Mr. Vallejos preemptively "chose to resign." *Id.*

The next week, Mr. Vallejos learned that Orbital ATK had not intended to fire him as a result of the investigation after all. *See* Dkt. No. 33-15 at 79:24–80:14. But Orbital ATK informed him that although "he was welcome to reapply for any openings [Orbital ATK] had in

4

the future," his resignation was "not reversible." Dkt. No. 33-20 at 3. Shortly thereafter, Mr. Vallejos filed a charge of discrimination with the Utah Antidiscrimination and Labor Commission. He later withdrew his claim and received a right to sue letter.

Mr. Vallejos then brought this action, alleging that Orbital ATK failed to accommodate his disability, in violation of the ADA, and retaliated against him for engaging in protected activities, in violation of the ADA and Title VII.[1]

## II.

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is material if it "might affect the outcome of the suit under the governing law"; a "dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

## III.

The court first addresses Mr. Vallejos's claim that Orbital ATK failed to accommodate his disability. An employer violates the ADA by failing to "make[] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability" unless such accommodation would pose an "undue hardship" on the employer. 42 U.S.C. § 12112(b)(5)(A).

---

[1] Mr. Vallejos also asserted a claim for discrimination based on disability, in violation of the ADA. *See* Dkt. No. 2 ¶¶ 45–57. But he "decided not to challenge" Orbital ATK's motion for summary judgment on this claim, and the court concludes that Orbital ATK has shown that it is entitled to summary judgment on it. Dkt. No. 36 at 37.

Under the burden-shifting framework that governs this claim, Mr. Vallejos must first make out a *prima facie* case by showing that "(1) he was disabled; (2) he was otherwise qualified; (3) he requested a plausibly reasonable accommodation; and (4) Defendant refused to accommodate his disability." *Dansie v. Union Pac. R.R. Co.*, 42 F.4th 1184, 1192 (10th Cir. 2022) (footnote omitted). "The burden then shifts to [Orbital ATK] to either rebut one or more elements of [Mr. Vallejos's] *prima facie* case, or establish an affirmative defense." *Edmonds-Radford v. Southwest Airlines Co.*, 17 F.4th 975, 992 (10th Cir. 2021). "If [Orbital ATK] does so, the burden shifts back to [Mr. Vallejos] to present evidence establishing a genuine dispute as to the affirmative defenses or as to the challenged elements of [his] *prima facie* case." *Id.*

Although Mr. Vallejos initially alleged that Orbital ATK failed to accommodate his lifting restrictions, *see* Dkt. No. 2 ¶¶ 32–44, he offered no response to Orbital ATK's motion for summary judgment on this theory and the court concludes that Orbital ATK has shown that it is entitled to summary judgment on it. Mr. Vallejos has also conceded, and the court agrees, that he cannot base a failure to accommodate claim on his need to care for his wife's disability. *See* Dkt. No. 36 at 31 n.3. The court thus focuses on Mr. Vallejos's claim that Orbital ATK failed to accommodate his diabetes. And regardless of whether Mr. Vallejos has identified evidence that could support a reasonable jury finding in his favor on the first three elements of his *prima facie* case, the court concludes that no reasonable jury could find that Orbital ATK refused to accommodate his diabetes.

Mr. Vallejos's doctor's note states that he "is unable to work night shifts because" he "has diabetes and an alternating schedule could worsen his blood sugars." Dkt. No. 33-18 at 2. And Orbital ATK's internal emails make clear that this note prompted Orbital ATK to consider various possible accommodations. *See* Dkt. No. 33-6 at 19–21. Then, at the January 20th meeting,

Orbital ATK's representatives and Mr. Vallejos discussed how Mr. Vallejos's diabetes could be accommodated. But although Orbital ATK offered various suggestions, Mr. Vallejos refused to accept anything short of a permanent assignment to the day shift.

After the discussions broke down, Mr. Vallejos, a mechanical maintenance mechanic, arranged to swap shifts with Mr. Aswaf, an electrical maintenance mechanic. This swap violated the rotating shift policy by creating an imbalance between the number of mechanical and electrical mechanics on each shift. Orbital ATK nevertheless approved the proposed swap. Mr. Vallejos thus worked the day shift for the remainder of his employment at Orbital ATK. There can be no dispute that this approved swap accommodated the concerns identified by Mr. Vallejos and his physician assistant, enabling him to perform the essential functions of his job despite his diabetes. Indeed, even Mr. Vallejos characterizes this accommodation as a "fix," albeit a temporary one. Dkt. No. 2 ¶ 27.

Mr. Vallejos nevertheless contends that because this swap was not permanent it was not a reasonable accommodation. Not so. Reasonable accommodations are "those accommodations which *presently, or in the near future*, enable the employee to perform the essential functions of his job." *Dansie*, 42 F.4th at 1193 (emphasis added; cleaned up). To be sure, Mr. Vallejos asserts in briefing that he had to "struggle every day to see if he could find somebody to trade shifts with him." Dkt. No. 36 at 32. But not only is this assertion unsupported by any identified evidence, it also directly contradicts Mr. Vallejos's complaint, which clearly alleges that he made a single swap that lasted until his employment ended. *See* Dkt. No. 2 ¶ 27. In all events, Mr. Vallejos identifies nothing in the record that could support a reasonable inference that his diabetes rendered him incapable of searching for other mechanics with whom he could swap future shifts.

7

Mr. Vallejos also notes that had he continued working at Orbital ATK, he would have needed another accommodation once Mr. Aswaf graduated and the swap ended. But under the ADA, "[i]t is not the employer's responsibility to anticipate the employee's needs and affirmatively offer accommodation if the employer is otherwise open to such requests." *Koessel v. Sublette Cnty. Sheriff's Dep't*, 717 F.3d 736, 745 (10th Cir. 2013). And nothing in the record suggests that Orbital ATK would have been unwilling to approve a subsequent shift swap. To the contrary, Mr. Vallejos himself testified that Orbital ATK was willing to approve *any* change: according to that testimony, Mr. Secrist stated that so long as "[s]omebody is working," "I don't care." Dkt. No. 33-15 at 54:24–55:2.

Mr. Vallejos also argues that Orbital ATK's approval of a temporary shift swap was unreasonable because it was not his preferred accommodation. But "under the ADA, a qualified individual with a disability is not entitled to the accommodation of her choice, but only to a reasonable accommodation." *Smith v. Midland Brake, Inc., a Div. of Echlin, Inc.*, 180 F.3d 1154, 1177 (10th Cir. 1999) (quoting *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1286 (11th Cir. 1997)). "If more than one accommodation would allow the individual to perform the essential functions of the position, the employer providing the accommodation has the ultimate discretion to choose between effective accommodations, and may choose the less expensive accommodation or the accommodation that is easier for it to provide." *Id.* (quoting *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1137 (8th Cir. 1999)) (cleaned up). And once an employer "has offered such [an accommodation], its duties have been discharged." *Id*.

Finally, to the extent Mr. Vallejos argues that his temporary accommodation was unreasonable because other employees were given permanent shifts, "[t]here is nothing in the [ADA] that requires that any benefit extended to one category of handicapped persons also be

8

extended to all other categories of handicapped persons." *Traynor v. Turnage*, 485 U.S. 535, 549 (1988) (addressing ADA's counterpart for federal employers); *see also Smith v. Ameritech*, 129 F.3d 857, 867 (6th Cir. 1997) (extending *Traynor*'s holding to the ADA).

For all of these reasons, the court grants summary judgment in favor of Orbital ATK on Mr. Vallejos's failure to accommodate claim.

## IV.

The court next addresses Mr. Vallejos's retaliation claims as alleged in his complaint and not subsequently abandoned. Because Mr. Vallejos has offered no direct evidence of retaliation, the court must "analyze his retaliation claim under the burden-shifting framework delineated in *McDonnell Douglas*." *E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, 1051 (10th Cir. 2011) (ADA); *see also Ward v. Jewell*, 772 F.3d 1199, 1201–03 (10th Cir. 2014) (Title VII).

"In order to establish a *prima facie* case of retaliation under the ADA, [Mr. Vallejos] must demonstrate (1) that he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action." *C.R. England, Inc.*, 644 F.3d at 1051 (cleaned up). Similarly, "[t]o establish a *prima facie case* of [Title VII] retaliation, [Mr. Vallejos] must show that: (1) [he] engaged in protected activity; (2) [he] suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse action." *Vaughn v. Villa*, 537 F.3d 1147, 1150 (10th Cir. 2008) (cleaned up).

The court concludes that Mr. Vallejos has identified evidence that could support a reasonable jury's finding that he engaged in protected activity. "Protected activities fall into two distinct categories: participation or opposition." *Id.* at 1151 (cleaned up). "Protected opposition

can range from filing formal charges to voicing informal complaints to superiors." *Hertz v. Luzenac Am., Inc.*, 370 F.3d 1014, 1015 (10th Cir. 2004). Mr. Vallejos alleged and testified that he engaged in protected opposition when he complained that Orbital ATK would not give him a permanent day-shift assignment because he was Hispanic. Mr. Vallejos also alleged and testified that he engaged in protected activity by requesting an accommodation for his diabetes.[2] "[A] request for accommodation can constitute protected activity supporting a retaliation claim." *Foster v. Mountain Coal Co., LLC*, 830 F.3d 1178, 1188 (10th Cir. 2016).

The court also concludes that Mr. Vallejos has provided evidence that could support a reasonable finding that he suffered adverse action. Indeed, it is undisputed that Mr. Vallejos was suspended and placed on leave—first with, and then without, pay.

The court concludes that a reasonable jury could not find that Mr. Vallejos was constructively discharged, however. A "[c]onstructive discharge occurs when an employer unlawfully creates working conditions so intolerable that a reasonable person in the employee's position would feel forced to resign." *Strickland v. United Parcel Serv., Inc.,* 555 F.3d 1224, 1228 (10th Cir. 2009) (cleaned up). This is a high bar—Mr. Vallejos must have had "no other choice but to resign." *Lowe v. Independent Sch. Dist. No. 1 of Logan Cnty.*, 363 F. App'x 548, 555 (10th Cir. 2010). But Mr. Vallejos did have a choice: he could have waited until the results of the investigation were communicated to him. *Cf. Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1222 (10th Cir. 2002) (holding there was no constructive discharge where, *inter alia*, the plaintiff resigned before he had complete details regarding the position to which he would be transferred).

---

[2] Although Mr. Vallejos initially alleged that Orbital ATK retaliated against him for requesting accommodations for his lifting restrictions and for complaining of disability discrimination, *see* Dkt. No. 2 ¶ 61, he offered no response to Orbital ATK's motion for summary judgment on these theories, and the court concludes that Orbital ATK has shown that it is entitled to summary judgment on them.

10

As for causation, Mr. Vallejos relied in his complaint on only the temporal proximity between his protected activities and the adverse action. *See* Dkt. No. 2 ¶ 66. But at the summary judgment hearing, Mr. Vallejos's counsel conceded that temporal proximity alone was "not enough" to establish causation in this case "because it's not very close." Dkt. No. 44 at 34:30–35:05 (recording of May 24, 2023, oral argument). This concession was clearly warranted: the Tenth Circuit has held that "where a considerable length of time has elapsed between a protected activity and an adverse employment action, a plaintiff wishing to survive summary judgment must present additional evidence tying the adverse employment actions to the plaintiff's protected activity." *Foster*, 830 F.3d at 1191 (cleaned up). And in his complaint, Mr. Vallejos alleges that "about three months separated [his] most recent request for an accommodation and his unpaid suspension." Dkt. No. 2 ¶ 66. But the Tenth Circuit has explicitly held that "a three-month period, standing alone, is insufficient to establish causation." *Anderson v. Coors Brewing*, 181 F.3d 1171, 1179 (10th Cir. 1999) (cleaned up). Mr. Vallejos's concession that the only basis for causation alleged in his complaint is inadequate is fatal to his retaliation claims.

In all events, even if Mr. Vallejos could establish a *prima facie* case of retaliation, under the *McDonnell Douglas* framework, the burden shifts to Orbital ATK to identify "a legitimate, nondiscriminatory reason for the adverse [employment] action." *Foster*, 830 F.3d at 1193–94 (cleaned up). And Orbital ATK has identified such a reason for placing Mr. Vallejos on leave: he was the subject of a sexual harassment investigation.

The court concludes that no reasonable jury could find this justification pretextual. To determine whether a proffered justification could reasonably be rejected as pretextual, the Tenth Circuit considers whether, on the one hand, the employer's "stated reasons were held in good faith at the time of the discharge, even if they later prove to be untrue," or, on the other hand, the

11

employer's "explanation was so weak, implausible, inconsistent, or incoherent that a reasonable fact finder could conclude that it was not an honestly held belief but rather was subterfuge for discrimination." *Young v. Dillon Cos.*, 468 F.3d 1243,1250 (10th Cir. 2006). Typically, a plaintiff will take one of three routes to establish pretext: "(1) with evidence that the defendant's stated reason for the adverse employment action was false; (2) with evidence that the defendant acted contrary to a written company policy . . . ; or (3) with evidence that the defendant acted contrary to an unwritten policy or contrary to company practice . . . ." *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000) (citations and footnote omitted).

Here, Mr. Vallejos does not identify evidence from which a reasonable jury could conclude that Orbital ATK's stated reason for the adverse action was false. He did testify that Mr. Desborough, who initially informed Mr. Vallejos that he would be suspended with pay, was regretful. *See* Dkt. No. 33-15 at 73:12–18. But Mr. Desborough's regret clearly cannot support a reasonable inference that Orbital ATK misrepresented the reason for the suspension. And although Mr. Vallejos points out that Orbital ATK later informed him that his suspension would be without pay, this clarification could not support a finding of pretext. Rather, the only evidence identified by the parties makes clear that Mr. Desborough made an innocent mistake or miscommunication and that Orbital ATK's policies contemplated unpaid suspension in these circumstances. *See* Dkt. No. 39-6 at 2; Dkt. No. 39-7 at 2.

Mr. Vallejos also notes that Orbital ATK never told him the identity of his accusers or what exactly he was accused of doing, it never allowed him to apologize to his unknown accusers, and it never told him he would not be fired. To be sure, "disturbing procedural irregularities can satisfy the requirements of a pretext claim." *Garrett*, 305 F.3d at 1220 (cleaned up). But Mr. Vallejos has identified no evidence here that could support a finding that Orbital

ATK's procedures were in fact irregular. To the contrary, Orbital ATK's harassment policy required that information relating to harassment complaints be kept confidential and disclosed only on a "need-to-know" basis. Dkt. No. 33-6 at 45.

And although Mr. Vallejos argues that Orbital ATK never told him he would not be fired, he did not give Orbital ATK a chance to tell him the results of the investigation. Rather, he assumed the worst and resigned before it could do so. He cannot now be heard to argue that Orbital ATK's not informing him that he would not be fired was a "subterfuge for discrimination." *Young*, 468 F.3d at 1250.

Mr. Vallejos also identifies other employees who were not fired after sexual harassment investigations. *See* Dkt. No. 36-2 at 18. But Mr. Vallejos was not fired, either. Rather, he alleges that he preemptively "chose to resign" "in order to prevent a sexual harassment complaint from being placed in his personnel file." Dkt. No. 2 ¶ 31.

More fundamentally, Mr. Vallejos identifies no evidence that could support a reasonable jury's finding that he would not have been placed on unpaid leave and subjected to the exact same investigation based on the complaints of sexual harassment leveled against him had he not engaged in protected conduct. It follows that no reasonable jury could find that Orbital ATK's proffered explanation for the adverse actions was pretextual.

The court grants summary judgment in favor of Orbital ATK on Mr. Vallejos's retaliation claims.

## V.

In his response to Orbital ATK's motion for summary judgment and at the hearing on this motion, Mr. Vallejos offered a new and different theory of retaliation. This theory focuses not on Orbital ATK's official actions or their justifications, but rather on the allegedly underhanded acts

and ill will of Mr. Vallejos's immediate supervisor, Mr. Secrist. Mr. Vallejos's original theory of constructive discharge—that his union representative told him that "it didn't look good" for him and that Mr. Vallejos voluntarily chose to resign to preempt the inclusion of the allegations of sexual harassment in his personnel file—has morphed into a theory that Mr. Secrist tricked and pressured Mr. Vallejos into resigning.

In stark contradiction to his complaint, Mr. Vallejos now contends that it was *Mr. Secrist*, not the union representative, who told him that the investigation was not yet completed but "did not look good" for him. He further contends that Mr. Secrist knew the investigation was over and that Orbital ATK would not fire Mr. Vallejos when he made this representation, but that he nevertheless deliberately misled Mr. Vallejos in order to prompt his resignation. Mr. Vallejos contends that Mr. Secrist then broke into Mr. Vallejos's locker and seized his belongings, refusing to return them until Mr. Vallejos signed a resignation form. As for why Mr. Secrist seized the opportunity presented by the investigation to engineer Mr. Vallejos's resignation in this underhanded and manipulative manner, Mr. Vallejos argues that Mr. Secrist's attitude toward him soured after he complained of discrimination at the January 20th meeting.

But this new theory of retaliation is not alleged in the complaint. It is not even close to what is alleged there. Indeed, in critical respects it *contradicts* the complaint—including with respect to who told Mr. Vallejos it "didn't look good" and why and how Mr. Vallejos resigned.

And Mr. Vallejos never sought leave to amend his complaint. To be sure, under Tenth Circuit precedent, a court *may* "interpret the inclusions of new allegations in a response to a motion for summary judgment, as a potential request to amend the complaint." *Adams v. C3 Pipeline Constr. Inc.*, 30 F.4th 943, 971 (10th. Cir. 2021) (cleaned up). But in this case the deadline for amending the complaint has long passed, and Mr. Vallejos has made no attempt to

show good cause to extend that deadline. *See* Dkt. No. 27 at 2; *S.G. by and through Gordon v. Jordan Sch. Dist.*, 333 F.R.D. 220, 224 (D. Utah 2019). Amendment is therefore improper, and the court will not consider Mr. Vallejos's new theory of retaliation.[3]

\*   \*   \*

For the foregoing reasons, summary judgment is **GRANTED** in favor of Orbital ATK on all of Mr. Vallejos's claims.

**IT IS SO ORDERED.**

DATED this 31st day of July, 2023.

Howard C. Nielson, Jr.
United States District Judge

---

[3] Indeed, even Mr. Vallejos's response to the summary judgment motion—where he first brought his new theory to the court's attention—was untimely. *See* Dkt. No. 32; DUCivR 7-1(a)(4)(B)(iii). And far from filing a motion establishing "excusable neglect," Fed. R. Civ. P. 6(b)(1)(B), Mr. Vallejos proffered only a perfunctory footnote in his belated response brief (as well as a *mea culpa* by counsel at the summary judgment hearing) acknowledging—but not adequately explaining or justifying—his default. *See* Dkt. No. 36 at 1 n.1. The court will not allow Mr. Vallejos to belatedly amend his complaint through an untimely brief—especially absent any showing of good cause or justifiable neglect. *See Gordon*, 333 F.R.D. at 224; *Perez v. El Tequila, LLC*, 847 F.3d 1247, 1253 (10th Cir. 2017).